## Case No. 14,666.

### UNITED STATES v. BROWN.

[3 McLean, 233.] [1]

Circuit Court, D. Ohio. July Term, 1843.

INDICTMENT—RULES OF PLEADING—PROOF—SURPLUSAGE—LARCENY FROM MAILS.

1. The rules of pleading are the same in civil and criminal cases.

2. Where the prosecutor states the offence with greater particularity than he is bound to do, the proof must correspond with the averments.

[Cited in U. S. v. Thomas, Case No. 16,473; U. S. v. Goodwin, 20 Fed. 240.]

[Cited in brief in Com. v. Dale, 144 Mass. 363, 11 N. E. 536. Cited in Schayer v. People (Colo. App.) 37 Pac. 44; U. S. v. Fuller (N. M.) 20 Pac. 179.]

3. That cannot be regarded as surplusage, which is connected with the offence.

[Cited in brief in Commonwealth v. Perry (Mass.) 11 N. E. 538; Com. v. Tolliver, 8 Gray, 386.]

The District Attorney, for plaintiff.
Mr. Stanton and Mr. Collier, for defendant.

## Case No. 14,667.

### UNITED STATES v. BROWN.

[4 McLean. 142.] [1]

Circuit Court, D. Ohio. July Term, 1846.

COUNTERFEITING — COIN —JURY — EVIDENCE— WEIGHT OF—REASONABLE DOUBT.

1. The act of congress punishes counterfeiting the gold and silver coin of the United States.

2. And also foreign gold and silver coin made current by the laws of the United States.

3. The jury are the exclusive judges of the credibility of the witnesses.

4. To authorize a verdict of guilty, the evidence must be satisfactory.

5. Not that the evidence must show the guilt of the accused beyond all doubt, but it must produce a reasonable conviction of the guilt of the accused in the minds of the jury.

[This was an indictment against James Brown for a violation of the act of congress of March, 1825, which provides the punishment for counterfeiting gold and silver coin.]

Mr. Bartley, U. S. Dist. Atty.
Swayne & Spaulding, for defendant.

McLEAN, Circuit Justice (charging jury). The great importance of this case, and the deep interest felt by the public in the trial, will induce me to state the case more in detail than has been my usual practice. The first count in the indictment charges the defendant with having counterfeited fifty pieces of coin, each piece thereof in the resemblance and similitude of the gold coin, which has been coined at the mint of the United States, called a quarter eagle, unlawfully, feloniously did falsely make, forge and counterfeit. In the second count, it is charged that he did cause and procure to be

1 [Reported by Hon. John McLean, Circuit Justice.]

1 [Reported by Hon. John McLean, Circuit Justice.]

falsely made, forged and counterfeited, the said coin. Third count, that he did willingly aid and assist in falsely making, forging and counterfeiting said coins, etc. The last count charges the defendant with falsely making thirty pieces of half dollars, of the similitude of half dollars coined at the mint.

By act of congress, the following silver coins are made current in the United States. "The Spanish pillar dollars, and the dollars of Mexico, Peru and Bolivia, of certain weight, etc. And gold coins are made current, to wit: the gold coins of Great Britain, Portugal and Brazil; the gold coins of France, of Spain, Mexico and Columbia," etc.

The act of congress of March 3, 1825, § 18 [4 Stat. 120], provides that "if any person shall falsely make, forge or counterfeit, or cause or procure to be falsely made, forged or counterfeited, or willingly aid or assist in falsely making, forging or counterfeiting any, in the resemblance or similitude of the gold or silver coin which has been, or hereafter may be coined at the mint of the United States; or in the resemblance or similitude of any foreign gold or silver coin which by law is or hereafter may be made current in the United States; or shall pass, utter, publish, or sell, or attempt to pass, utter, publish, or sell, or bring into the United States, from any foreign place, with intent to pass, utter, publish or sell as true, any such false, forged or counterfeited coin, knowing the same to be false, forged or counterfeited, with intent to defraud," etc., shall be punished, etc.

Mr. Jane, a witness, states—After Brown's arrest, searched his house, and found in the garret, in a barrel, a number of cups made of copper and zinc. And also, between the garret floor and the lathing, the iron tools presented. Found in a lower room a trunk, having within it bank note paper, containing articles of jewelry, scissors and cords, etc.

William Savage—Is a jeweler acquainted with gilding. Cups used for galvanic gilding, connected by wires; quarter eagles shown, given the appearance of gold by galvanizing. This art, for gilding, etc., was sold through many parts of the country some years ago. The two quarter eagles presented, galvanized—the others, fire gilded. All counterfeited.

Mr. Wheeler—Is an engraver and copperplate maker. The iron instruments are part of the press of a copperplate printer, and might be used for a bank note press. Part of the paper found in the trunk, bank note paper. Specimens of notes, not on bank paper, at least some of them.

John H. Bellows—Has been acquainted with defendant ten or twelve years, by sight. Lives from ten to twelve miles from him. In May, 1845, witness had a conversation with defendant, at his own house. A short time before this, witness had returned from Indiana. Defendant asked witness if he had seen Hoskison, and inquired what business he followed—said that he had been engaged in counterfeiting. Defendant inquired what kind of money they had there, and if he had seen any of their counterfeit gold? Witness answered in the negative—did not know there was any. Defendant replied that a good article of that kind could be got up. Also, that good articles of paper and silver could be got up, but specified no particular bank. Before witness left defendant's house, a day was appointed at which they should meet at Akron, to exhibit counterfeit money —understood hard money. But no opportunity being afforded to examine the money when they met at Akron, defendant requested witness to call at his house. Witness called 5th July, but did not see defendant, he being not well or fit for business. On 7th July, witness called again. Defendant showed him some of his money—$20 on Yates County Bank, New York—which was counterfeit. Received five $20 bills on this bank. Defendant said that himself and others would be at work soon, and would get it up; and he requested witness to call again about the money, as soon as he could. Witness called again 23d July, when defendant informed him that he would have gold in about four weeks. That a man who could make it, they had sent for to Detroit, but he had not come. That they would send for him again—the man's family had been sick, which prevented his coming. Defendant at this time showed witness notes on Yates County Bank. Witness got from him sixty dollars in $20 bills. Before this, received from defendant five bills on some bank, each $20; for all of which, he paid twenty cents on the dollar. Defendant requested witness to come down in four weeks, and he would have the gold ready. Witness called at the time requested, but the man from Detroit had not yet come, his family still being sick, but defendant assured witness that he would be there in a few days. Defendant complained that it was a hard country to get up a thing of the kind in, and did not know but that he should have to go to Pittsburgh for materials. He supposed they were watched —that there were many persons there who interfered with other people's business. And defendant proposed that witness should come in the night. The next visit was made in the night, and the witness was accompanied by Jacob Smith. On this visit, defendant talked with the witness about the gold, but it was not yet ready; in a short time it would be. Defendant showed witness counterfeit dollars and fifty cent pieces. Received fifty dollars from defendant; fifteen dollars in Mexican dollars, the balance in fifty cent pieces —not a very good article, but defendant said it would do him good. This was in August. Defendant said the man to make the gold was there; said if witness would come down such an evening, would have some gold; that they were at work night and day, and also

defendant; that the place where the gold was made was at a blacksmith's, a friend of the defendant's, who lived in a private place. Witness remained three-fourths of an hour. After he left with Smith, he showed him one of the pieces of coin. Next visit by witness, had with the defendant similar conversation with the above, but was disappointed in obtaining gold. He received from the defendant, at Hardy's grocery, as he now explains, some $3 bills, four of them on Louisville. Defendant promised to send the gold to him on the next Saturday. On 1st November, defendant sent by Wheeler two hundred and twenty-five dollars in gold, one hundred and twenty-five of which were in quarter eagles, or 20 shilling pieces, the balance in sovereigns. Sold to defendant a horse for seventy or seventy-five dollars, and a yoke of cattle at sixty or sixty-five dollars. Wheeler took away the horse the same evening he handed to witness the gold. For the paper he was to pay twenty cents on the dollar, and for the gold thirty-three and one-third per cent. in the horse and oxen and in good money. Afterward, witness saw Brown, who informed him that he liked the horse well, and he asked witness how he liked the gold. Witness replied that it was rather light. Defendant said it was the kind they had made and were making. November 13th, witness received fifty dollars in quarter eagles, in the night, in part payment for the horse and cattle. At different times witness had loaned defendant from one to five dollars, which were never returned. This was the last time witness got money from defendant. Witness saw a man called Stranahan at the grocery. Defendant said to him, "that is the man who made the money." Witness says he let Martin have about one hundred dollars in gold. Booth got some twenty or thirty dollars of the silver. Witness returned some of the silver to Brown, and told him he had better work it over. When witness was arrested, had gold pieces hid in the corn house at his father's— directed Martin to get it. Witness does not remember the exact sum, but it amounted to perhaps thirty dollars. Martin accompanied witness sometimes when he visited Brown. In fore part of July witness saw Holt at Tiffin, and also in April before. He was the same Holt to whom he gave counterfeit money. August 19th, witness received fifty dollars in silver from defendant.

Jacob Smith—Went to Brown's in company with Bellows, at his request. This was after dark. Witness did not go into the house, but remained in the road from a half to three-quarters of an hour. He saw Bellows and Brown out of the house, talking together. After they left Brown's, Bellows showed him, and perhaps handed him, a roll of coins, and took out one or two half dollars.

John W. Rickets—Saw Brown in 1840, when he observed to witness, "You ought to become better acquainted with me." And asked witness "if he understood him?" Some time last fall defendant handed witness a genuine half eagle, and requested witness to get two quarter eagles for it, which he did. Afterward defendant wrote a note to Hiram Brown, requesting him and witness to send to him five dollars in gold. On Monday evening witness sent to him a quarter eagle, and Brown sent a sovereign. Witness was arrested at the time the defendant was arrested. Defendant charged witness that he must never say anything about the two quarter eagles sent to the defendant. He told witness that they were making quarter eagles down there, near his house; and he said these were a good article. About 1st December, 1845, Brown requested witness to inquire what kind of a scrape Bellows had got into, in Stark county. Witness made the inquiry of Bellows, and stated to Brown that he had got into no scrape which he could not easily get out of. Brown said he was glad to hear it, as Bellows was a clever fellow, and that he was right.

Matthias Martin—Became acquainted with Brown in 1845, in the fall. Went after night, with Bellows, to defendant's house, two or three times in all. Witness remained out of doors to watch the horses, supposing defendant and Bellows did not wish his presence. The first visit, witness thinks they remained at Brown's about an hour. As Bellows was about leaving, saw Brown at the door of his house. The second visit, Bellows remained longer than the first one. Saw Brown, when Bellows came out, at the door, as before. The night was not dark, and witness was in the door yard. Whether there were three visits or not, in which he accompanied Bellows to Brown's, witness can not be certain. But the last visit, heard Brown say, "Jack, you shall have that money on Saturday morning next, and I will either bring or send it to you." This was Wednesday. Something about danger was said, when Bellows observed, "There is no danger." The next Saturday after, saw a man riding one horse away from old Mr. Bellows's, and leading another. Same evening, Bellows opened and showed witness a roll of money—quarter eagles and some other gold pieces. This was done in five minutes after the horse was led off. Went the same evening, with Bellows, to Brimfield. Saw Booth at that place, to whom Bellows gave $50. Returned home the same night. Witness got from Bellows $50, in quarter eagles; and Booth showed witness the same sum which he received.

Thomas McKinstry—Some time before Brown was arrested, witness received a counterfeit quarter eagle from defendant. Witness had applied to defendant to discover where a bogus machine had been conveyed, and he promised to make the discovery, if aid could be given to his son Daniel in Michigan, who had been indicted for counterfeiting coin; and, also, that certain influences should be used with the marshal and dis-

trict attorney of this state, to pardon the defendant.

Defendant's evidence:

Cook—Claims the trunk as his property, and its contents, including the iron instruments exhibited—that he is a "steel and copper plate printer," and a printer of bank notes. Is associated at St. Louis with Witchell, under the firm of Witchell and Cook—that his partner is an engraver. That in 1845, witness arrived at Cleveland from Buffalo, on his way to Pittsburgh. Took passage on the canal boat commanded by Captain Baxter. Being short of money, he made an arrangement with Daniel Brown, who came on board the boat, that the latter should advance to the witness $25, for which witness should pay $30, and would pledge the trunk now in court, with its contents, for the payment of the money. The trunk to be forwarded to the address of witness so soon as the money was paid. The 24th September, 1845, the trunk was carried from the canal boat to Brown's, by the witness and Daniel Brown, witness leaving immediately, and overtaking the boat. Witness went to Pittsburgh, hired an office, remained there a few days, left, and has not since returned. Paid six months rent. Witness lived at Cincinnati—worked at his trade with a certain firm—printed notes for the trust company and other banks. Came through Akron—received there a letter from Daniel Brown. Remained but a short time—came on—remained at Amity six days. Passed through this city—went on to Jeffersonville, twelve or fourteen miles south of this place, where he saw Daniel Brown, with whom he remained only a short time, and then returned to this city.

M. C. Richardson—Keeps a public house at Cleveland—Cook stopped with him, took the canal boat, etc.

Hiram Adams—Saw Cook at Cleveland—recommended him to Capt. Baxter's boat.

R. D. Baxter—Commanded the canal boat Hibernia in the fall of 1845. Took Cook on board at Cleveland, and also Daniel Brown, near that place. Was called to witness a loan of money by Brown to Cook, $25, for which the latter was to pay $30, and pledged his trunk and its contents, which were seen by witness, for the payment of the loan—the trunk, etc., to be sent to Cook on the payment of the money. When opposite Brown's house, Cook and Daniel Brown took the trunk out of the boat, and carried it toward Brown's house. In some three or four miles, Cook overtook the boat.

Alex. Patton—Worked as a house carpenter two months last summer, beginning the fore part of July, for Daniel Brown, who lived in the same house with his father. Had free access to every part of the house. Laid a part of the garret floor. Saw in an old barrel, which he used for scaffolding, the materials presented, and which composed a part of a galvanic battery. Witness saw

John H. Bellows at Brown's one evening. He was in company with some other person, who remained on his horse in the road. Bellows got down, went into the house. Witness knows Daniel Brown was at home, but is not certain whether the defendant was at home or not. Bellows returned to the road, after having remained some time in the house, and he and his companion rode off.

Benjamin Tewell—Some three years ago, a man came to Akron to sell receipts for constructing galvanizing batteries, named Ady. Witness, in conjunction with Daniel Brown, bought one. Had the machine constructed, and left it at Brown's. Had another one built, which he sold for a horse which was kept by Daniel Brown, who agreed to pay witness $25.

L. G. Steinhour—In the fall of 1845, witness being on his way to Brown's, to collect from him a note, about a quarter of a mile before he reached Brown's, he saw two persons, one was sitting in the shade, the other was riding his horse up and down the road, apparently to show his paces or gait. Bellows was on horseback, who asked the witness where he was going. Witness answered, to Brown's, to see if he could get payment on a note in dimes, etc. Bellows told witness Brown was not at home, on which witness returned. Wheeler was the person sitting in the shade. Bellows asked witness to get up behind him, to ride over the river; but witness declined, saying he had borrowed a canoe to cross, and must cross the river in it. After crossing, he fell in with Bellows on the tow path. Came to a waste weir, and witness rode over it, behind Bellows. Witness observed to Bellows that he had a good horse. Yes, B. replied, but he is not mine; I have sold him to Wheeler for $70 or $75; and that he had also sold to Wheeler a yoke of oxen; that Wheeler lived with old Jim. Witness heard Bellows swear against Brown before the commissioner, and afterward witness asked him what induced him to swear as he had done, in relation to the horse. Bellows replied that every one had his own notions in regard to swearing. Afterward Bellows saw witness, and requested him to say nothing about what he had said to him. Thinks he saw Bellows at Brown's, the latter part of October, 1845.

C. B. M'Donald—Has known John H. Bellows five years. Said that he supposed the people might think him a scoundrel, for coming out and disclosing, as he had done to Mr. Otis, against Brown. That he was under the necessity of doing so for his own safety. That he would never be a witness against James Brown. Saw the yoke of cattle in Wheeler's possession, who offered to sell them. This might have been in August last.

John Boosinger—Told his son and John Bellows, who were in jail, that Mills wanted them to turn state's evidence against Brown;

both said they knew nothing against Brown. Mills said they wanted to get hold of the leaders of the gang.

J. D. Wild—Lives at lock, one and a half miles below Brown's, since the 22d July, 1845. Saw John H. Bellows at the lock on January 7th, the Wednesday before the defendant was arrested—inquired for Wheeler—went toward Akron. James Brown was at the lock on the 4th of July, 1845: remained all night, and also on the 5th, until one or two o'clock. Next Monday, 7th of July, defendant came to the grocery at the lock—was on horseback—rode toward Cleveland. On the 4th or 5th, Brown was drinking, but can not say that he was drunk.

Moses O'Brien—After Brown had his trial, talking in the street with some persons, Bellows came up to them, touched him on the shoulder, and stepping aside, observed to witness that he had got into a scrape. Bellows said it was proposed that he should go clear, if he would come out and prosecute Brown. Bellows wanted witness to take money, and say that Brown had given it to him. Witness replied that he would have nothing to do with it. Witness only knew Bellows from sight. Witness got a letter out of a certain post office for Wheeler, and received from him one dollar.

B. C. Mosher—Lives in Providence, Lucas county. In the latter part of July, or forepart of August, saw Bellows at Tiffin. Was about buying a horse of witness; agreed to give $75. Went into a room, and Bellows offered him gold, quarter eagles, which witness refused to take, supposing it not good. Bellows had, in appearance, one hundred quarter eagles. Witness described Bellows as wearing a cap, and a coat of certain cut and material.

John Hobbie—Was at Brown's on the 7th July, 1845—made inquiry, and was informed that Brown was not at home. Wheeler has lived at Brown's since March, 1845. Yoke of cattle taken to defendant's in August last. Thinks the horse was taken to Brown's the forepart of October.

Alexander Burton—Heard the greater part of the evidence of Bellows before the commissioner, against Brown. Understood from Bellows, that he called on Brown to know if he had counterfeit money; Brown said an article of the kind could be got up. Stated that he got money the 5th of July. Said nothing as to his meeting Brown in Akron, as now stated by him, to talk with him about counterfeit money. Can not say when Bellows stated before the commissioner at what time his first interview took place with Brown.

Gen. Burse—Acted as counsel for Brown before the commissioner. Took minutes of Bellows's evidence. Bellows said that he went to Brown's to get counterfeit money. This was the first time he conversed with Brown. Brown said such an article could be got up, and Bellows then asked him to get it up. This was the latter part of May. Said he called on the 5th of July; saw Brown and his wife, and got $100. This was between 12 and 2 o'clock on the 5th; said nothing of being at Brown's on the 7th of July. He said he got the gold the latter part of October—contract for oxen was made in July; called latter part of July or 1st of August. Next visit latter part of August or 1st of September; next, latter part of September, or beginning of October. Bellows stated that he received on the 4th, three dollar bills, at Hardy's grocery, from Brown; several persons were present. Brown asked him to step aside, and presented to him these bills—said they were something new, and might do him some good. The cattle, he said, were sold for $60; the horse for $75. Stated that the gold was sent to him by Wheeler, the latter part of October. That about the 1st of September got the half dollars. Said nothing about Martin. Did not state that any one was with him at Brown's, except Smith. About six weeks before examination before commissioner, got in gold from Brown $45. After Bellows was confined, witness called on him as counsel—stated his case. Afterward Bellows was asked what he knew about Brown, when he replied that he never saw Brown have any counterfeit money, that he had talked with him about it. Bellows said, several were drinking at a grocery, when some one threw down a half dollar; it was remarked that was bogus money. Brown said, if that is bogus money, I have plenty more just like it. That is all, Bellows said, that I have ever heard Brown say about counterfeit money. Rickets was sworn on Hiram Brown's trial, but he said nothing about Brown's having counterfeit silver. He said that he knew nothing against Brown.

Zebulon Jones—Heard Bellows swear before the commissioner; said he was positive he received money the 5th July; said nothing about Brown's being intoxicated the 4th July—did not name the 7th. Bellows said that Brown said such an article could be got up, and witness advised him to get it up. Nothing said of getting New York bills 23rd July—omitted other things.

Rebutting evidence, United States:

Horace Kay—Has been acquainted with Steinhour eight years. His character for truth is not good. Witness would believe him under oath as he believes other witnesses.

Hiram Fuller—Some say Steinhour's character is not good; can not say how the majority speak on that subject.

Major Cole—Keeps Union hall in this city —Cook, the witness, stopped with him. Brought to his house the trunk exhibited in court—took it away some days since.

In support of United States' witnesses:

Warren H. Smith—Has known Rickets eight or nine years. His general character is good for truth. Witness would believe him

under oath. Knows Bellows; his character for truth is good. Witness would believe him under oath, where there were corroborating circumstances.

Mr. Spicer—Has been acquainted with Bellows since he was a boy—his character for truth is good, and witness would believe him under oath.

Israel Allen—Has known Bellows twelve or fifteen years. Knows no reason why witness should not believe him under oath. Nothing known against Bellows except his connection with the defendant. Witness thinks he varied some in his statement here, from his evidence before the commissioner.

Alexander Brewster—Has known Bellows since a child—his character for truth is good. Nothing against him except his connection with the defendant. Before this occurrence, would have believed him—and now, can not say that he could disbelieve him under oath. Some variance, owing, as witness supposes, to different questions. .

Mr. Jane, Sheff.—Bellows stated before the commissioner, that Brown, in their first interview, asked him if he had seen any coins—thinks he referred to witness' trip to Indiana. Brown said an article could be got up—that the conversation commenced about farming. Bellows said, repeatedly, he could not recollect all his visits to Brown, or the dates. There was a variation from the 5th to the 7th July, between his statement on this trial, and before the commissioner. McDaniel's general character for truth is bad. Witness would not believe him under oath. Bellows said before the commissioner, that he received the Louisville notes at Hardy's grocery.

John H. Bellows—After 7th July went to Tiffin—wore a grey striped frock coat and hat. Was there only once in July. Had with him no counterfeit gold coin. He kept an account on a board of the moneys received from Brown. By a reference to those dates he is able to speak more specifically now than before the commissioner. His statements before him were made when he could not refer to his account. Does not recollect of having stated in his examination here that the Louisville notes were received at Brown's; if he did say so he was mistaken, as they were received at the grocery.

Ithamer Bellows—His son was absent four or five days in July—forepart of the month. Wore a striped frock coat and hat, when he went away and when he returned. Was absent only this time in the month of July.

Joseph C. Jones—About five years ago became acquainted with Cook. His general character for truth not good. He never printed any notes for the trust company.

Rebutting by defendant:

Samuel Edgerly—Does not know any thing in the neighborhood prejudicial to the truth of Steinhour. O'Brien's character is good.

General Burse—Would believe O'Brien under oath.

Zebulon Jones—Knows nothing against Steinhour.

A. Miller—Steinhour, where morals are concerned, is a small pattern. McDaniel's character the same.

Mr. Lee—Would believe Steinhour under oath.

Patrick Christy—Steinhour does not always adhere to the truth.

The circumstances of this case are somewhat peculiar. The jury can not but perceive that the defendant, from the qualities of his mind, and the energy of his character, as disclosed in the evidence, exercises an uncommon influence over those with whom he associates. Indeed, he is not undistinguished in the county of his residence. He at this time holds the commission of justice of the peace, elected by his fellow citizens, and it appears he has much influence in the neighborhood.

The strongest witness against the defendant is Bellows. This witness is impeached by his own admissions, that, for some time, he was an accomplice with the defendant. The counsel in the defense have assailed this witness on four grounds. 1. That he is an accomplice. 2. That a motive of revenge, or a corrupt influence, induced him to give evidence in behalf of the prosecution. 3. That there are contradictions in his statements. 4. That he is contradicted by other witnesses. The contradictions consist mainly in declaring, as you have observed in the testimony, that he sold the oxen and horse to Wheeler, and that he knew nothing against Brown. Steinhour swears that such was Bellows' declaration the day he met him near Brown's. The character of Steinhour is assailed by proof that his reputation for truth among his neighbors, is not good, while other witnesses think him worthy of credit. In judging of the credibility of a witness, the jury will always consider the circumstances under which he testifies, and under which his statements at different times were made. This remark will apply to the witness Bellows. Some of the contradictions charged against him are explained, and others are accounted for by the peculiar circumstances under which he was placed. It appears from the testimony of Mr. Otis, a highly respectable member of the bar, at Akron, and Mr. Mills, a deputy marshal, that Bellows was much influenced by their advice in disclosing the facts. Accomplices are often used for this purpose, and not unfrequently, great good is done to the public through the evidence of accomplices.

As a general rule, it is said that a jury will not convict on the testimony of an accomplice, uncorroborated by other evidence. In this case, it is contended that much of the evidence of Bellows is corroborated. As for instance, the sale of the oxen. It was proved by E. R. Bellows, and others, that he was seen on Brown's farm several times. The sale of the horse, which he swears to,

is also proved by others; and that he was seen in possession of the gold. Hiram Ayres, Jacob Smith and Matthias Martin, establish many of the facts stated by Bellows, which go to the most important statements made by him. Several of the witnesses, who have long known Bellows, notwithstanding his connection with the defendant, would believe him under oath, and say his character for truth is good. You, gentlemen, are exclusively to judge of the credit due to the witnesses. You are to weigh the evidence, and in the exercise of your own judgment, will come to the decision as to the guilt or innocence of the defendant. Your minds must be clear as to his guilt, before you convict him. Not that clearness which excludes all doubt, but a rational conviction of guilt, which is satisfactory to your consciences.

The jury found the defendant guilty, and he was sentenced to hard labor in the penitentiary for ——— years.